**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KRAMONT OPERATING PARTNERSHIP, L.P.   :       CIVIL ACTION
                                                           :
                  v.                                    :
                                                           :       NO. 07-1430
H. IRWIN LEVY                                          :

**<u>MEMORANDUM</u>**

**Baylson, J.**                                                                **June 12, 2008**

**I.**      **<u>Introduction</u>**

       The issue presented on the parties' cross motions for summary judgment involves liability for certain taxes in the context of sale of assets and change of ownership of Plaintiff, Kramont Operating Partnership, L.P. ("Plaintiff" or "Kramont").  Kramont alleges Defendant Irwin Levy, ("Defendant" or "Levy"), refused to repay Plaintiff for payment of Defendant's share of the income taxes related to Defendant's gain in the sale of Plaintiff's assets.  Count II of the Complaint states a breach of contract claim against Levy.[1]  Count III alleges that Levy interfered with the contractual obligations of three other Kramont limited partners who are related to him, to repay the "loans" Kramont alleges it made to them by paying their share of taxes related to Kramont's sale of assets.

       The Court finds for Defendant, granting his Motion for Summary Judgment and denying Plaintiff's Cross-Motion for Summary Judgment.

---

[1] Plaintiff also brought a breach of contract claim against another one of its limited partners, Murray Goodman, which was Count I of the Complaint.  Plaintiff settled with Mr. Goodman.

II.   **Background**

    A.   **Procedural Background and Contentions**

After discovery, Defendant filed a Motion for Summary Judgment (Doc. No. 36) and Plaintiff then filed a Cross-Motion for Summary Judgment.  (Doc. No. 38).  Both parties filed, upon request of the Court, a stipulated Chronology of Events (Doc. No. 43) and responses.  (Doc. Nos. 39, 40).  The Court held oral argument on April 17, 2008, after which parties were allowed to file supplemental briefing.  (Doc. Nos. 47, 48).

Plaintiff asserts that Defendant owes taxes incurred by the sale of assets of Kramont, and that Defendant committed tortious interference when he advised three members of his family, also former partners in Kramont, that they should not pay these taxes.  Defendant denies that he owes Kramont for the taxes in question because the new owners of the partnership are responsible for paying the taxes.  Defendant asserts that the Partnership Agreement, which bound Levy to compensate Kramont for taxes he owed to the partnership, did not bind him to pay taxes on profits made from the sale of Kramont.  The merger documents, which govern the sale of the partnership assets, are silent on the issue.  Defendant also asserts that he did nothing improper when he spoke to his family members about his decision not to pay the taxes.

    B.   **Factual Background**

On June 16, 2000, Kramont was formed and Kramont Trust became the sole General Partner.  Levy, as well as several other members of his family, had a partnership interest in Kramont between June 2000 and January 2005.  For federal and state income tax purposes, the Kramont entity, which existed between 2000 and 2004, was not a tax-paying entity, because it passed its taxable income through its partners, including Levy.  However, the Partnership

Agreement (¶ 10.4) obligated the partnership to pay taxes "with respect to any amount

distributable or allocable to such limited partner pursuant to this Agreement" and authorized the

partnership to withhold such amounts from distribution made to partners, or to consider the

amount paid as a loan to the partners.  In 2000-2004, Kramont paid all taxes on income up-front,

and then the partners, including Levy, reimbursed Kramont for a percentage of taxes Kramont

paid on their behalf.  For the years 2000-2004, Levy paid the specified percentage of Kramont's

taxes without objection and before any interest accrued.  According to the briefs, these taxes

were principally, if not exclusively, federal and state income taxes.

       In January 2005, Kramont began the process of merging with several other companies

pursuant to an integrated "Agreement and Plan of Merger."  The parties' Stipulated Chronology

of Events (Doc. No. 43) details the merger events in the following order.  The precise times, as

noted in the merger agreements as a sequence of events, were important to the parties:

>       8.      April 18, 2005: Closing date for the various mergers as set
> forth and agreed to in the Merger Agreement.
>
>       9.      April 18, 2005 at 4:02 p.m: Certificate of Merger of CWAR
> OP Merger Sub, LLC into Kramont OP was filed with the
> Secretary of State of the State of Delaware.  As a result, 4:02 p.m.
> on April 18, 2005 became the "OP Effective Time" under the
> Merger Agreement.
>
>       10.     April 18, 2005 at 4:18 p.m: Articles of Merger of Kramont
> Trust into REIT Merger Sub (CWAR OP Merger Sub III Trust)
> were filed with the State of Maryland.  As a result, 4:18 p.m. on
> April 18, 2005 became the "REIT Effective Time."
>
>       11.     April 18, 2005 immediately after the OP Effective Time of
> 4:02 p.m. and prior to the REIT Effective Time of 4:18 p.m:
> Centro Watt America III OP, LLC became the General Partner of
> Kramont OP; Centro Watt America III, L.P. became the Limited
> Partner of Kramont OP; and the surviving Kramont OP adopted the

"Amended and Restated Limited Partnership Agreement dated as of April 18, 2005.

Following the mergers as described above, Levy received consideration for his Kramont ownership interest.

The surviving entity was still Kramont, but it was now controlled by an Australian Entity called Centro Watt.  Each unit of Kramont was bought out for $23.50 per partnership unit and Levy received full compensation at this rate for the stock he owned.  Levy was Chairman of the Board of Kramont before the merger and highly involved in the merger negotiations.

After Kramont sold its assets pursuant to the Merger Agreement, it was required to pay nonresident taxes on the sale in several states, including the states of New Jersey and Pennsylvania.  Kramont paid in excess of one million dollars in withholding taxes and asserts that it has a right to be reimbursed by the former partners for these payments pursuant to ¶ 10.4 of the Partnership Agreement.  The Merger Agreement is silent as to who would pay the taxes owed on the sale.

In 2005 and 2006, Kramont sent Levy three notices, claiming that Levy was responsible for paying the nonresident tax burden for his share of the partnership.  Levy refused to reimburse Kramont, asserting that he was not required to pay taxes on the sale of the business because the surviving business entity, controlled by the limited partners of Centro Watt, was responsible for paying the owed income taxes.

On July 5, 2006, Grant Thornton, the Kramont auditor, authored a letter advising Levy that Kramont, a pass through entity, was obligated pursuant to state regulations to remit state income tax for any positive income flow through non-resident partners.  Levy responded to the

-4-

letter, stating that he would not pay the requested taxes since he believed their conclusion was incorrect.

In 2006, Levy filed returns with both the New Jersey and Pennsylvania taxing authorities, representing that non-resident withholding taxes were paid on his behalf by Kramont.  The returns were not dated.

Several members of Mr. Levy's family, Robert Levy, Lillian Levy, and Jenny Levy, were also partners in Kramont, either in their individual capacity or as trustees.  These family members also refuse to pay the share of the non-withholding sales taxes for which Kramont believes they are responsible.  Kramont alleges that these family members have not paid, based on advice they received from Levy.  Levy does not deny speaking to his family members about the matter.  He claims that each of them sought out his advice and that he told them that he was not paying Kramont for the taxes but did not tell them what action they should take.  Robert, Lillian, and Jenny Levy have testified in depositions that they called Levy to determine whether or not they should pay the taxes that Kramont demanded and that he told them that he was not planning to pay, but that he never specifically told them that they should not pay.

 In the Plan of Merger, the acquiring Centro Watt entities receive the profits from Kramont operations in the year 2005.  Levy alleges that this effectively amended the Partnership Agreement by denying its limited partners a quarterly distribution to which they would otherwise be entitled and thereby signaled the intent of the parties to make the new business entity, controlled by Centro Watt, responsible for all taxes going forward.  Kramont claims that Section 10.4 of the Partnership Agreement, which makes partners responsible for Kramont's taxes, binds Levy and other partners through the time of the sale.  Levy counters that the Partnership

Agreement is superceded by the Merger Agreement.

The parties cite no case precedent on this specific issue.  The argument comes down to whether the Partnership Agreement bound the partners through the time of the sale, or whether the Merger Agreement superceded the Partnership Agreement for the purposes of this tax issue.

Kramont asks for entry of summary judgment in its favor in the amount of $261,798.86, for the principal and interest owed on the breach of contract claim, plus damages on the tortious interference claim.

**III.**   **Legal Standards**

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions.  Southeastern Pa. Transit Auth. v. Pennsylvania Pub. Util. Comm'n, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met

-6-

simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## IV.    Discussion

Although the Court has considered whether a trial is necessary to determine the intent of the parties, careful review of the documents results in a decision based on the nature of the taxes due in the context of the written agreements.

As a threshold issue, the Court must determine whether to apply Delaware or Pennsylvania law for each count.  A federal court exercising diversity jurisdiction must apply the choice-of law-rules of the forum state, in this case, Pennsylvania.  Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 497 (1941).   Regarding Count II, Plaintiff's breach of contract claim, the Court will apply Delaware law for the following reasons.

Kramont was formed in Delaware, pursuant to Delaware's Revised Uniform Partnership Act, and the 2005 Kramont Partnership Agreement contains a choice of law provision which states: "[t]he laws of the State of Delaware shall govern the validity of this Agreement and the construction of its terms."  (App. to Def.'s Mot. for Summ. J. Doc. No. 38, § 7.2).  The June 16,

2000 Kramont Partnership Agreement also stipulates that the partnership should be governed by Delaware law.  (Pl.'s Exs. to Mot. for Summ. J., Doc. No. 36, Ex. No. 3, § 15.10).

The Merger Agreement has a choice of law section which provides that the governing law will be New York, Maryland or Delaware, depending on which merger is being considered.  (Id. at Ex. No. 8, § 9.7)  The Agreement provides that the "Subsidiary Mergers and matters pertaining thereto" will be governed by Delaware law.  The Court believes that the impact of the tax issue is governed as part of the Subsidiary Mergers, but counsel have not shown any conflict among the laws of New York, Maryland or Delaware on the issues presented here, that presents a conflict in the choice of law.

Pennsylvania courts generally honor the intent of the contracting parties to enforce choice-of-law provisions in contracts.  Kruzits v. Okuma Machine Tool, 40 F.3d 52, 55 (3d Cir. 1994).  In addition, it should be noted that the parties do not dispute that Delaware law should be applied here.

As for Count III, Plaintiff's tortious interference claim, Pennsylvania law governs.  Both Pennsylvania and Delaware have adopted the Restatement (Second) of Torts, § 766, governing causes of action for intentional interference with contractual relations.  Pennsylvania choice-of-law analysis dictates that where there is no conflict among states' potentially applicable laws, courts presume the law of the forum state applies.  Hammersmith v. TIGS Ins. Co., 480 F.3d 220, 230 (3d. Cir. 2007).

**A.      Defendant's Motion for Summary Judgment as to the
          Breach of Contract Claim**

The Court's decision regarding Plaintiff's breach of contract claim must rest on what the

taxable event was and when it occurred.  At oral argument, Defendant asserted, and the Court concludes, that the taxable event was the sale of Kramont's assets to Centro Watt.[2]  Plaintiff contends that this occurred directly before OP Effective Time and Defendants assert that it took place after OP Effective Time, upon the conclusion of the last of the three mergers.  (Tr. 4/17/08, p. 17).  The Court agrees with Defendant and concludes that this event took place after all of the merger agreements had been completed on April 18, 2005.  Thus, the taxes were owed by the Plaintiff as the surviving entity after the mergers, the entity now controlled by Centro Watt.

Plaintiff has taken various positions in support of its claim, most recently asserting that § 708 of the Internal Revenue Service, 26 U.S.C. § 708, controls by defining the termination of a partnership by certain rules that govern this situation.  The Court rejects the Plaintiff's arguments for basically two reasons.

First, the taxes at issue here are state taxes, not federal taxes, and therefore the Internal Revenue Code is not relevant.  Also, a review of § 708 demonstrates that it is designed to secure payment of taxes as the result of the termination of a partnership.  The issue in this case is not whether taxes are due, but rather who is responsible for them.  For these reasons, the Court rejects the Plaintiff's reliance on § 708.

Second, the issue presented requires the Court to determine the effect of the various agreements in place, specifically the Partnership Agreement and the Merger Agreement.  The

---

[2]As a review of the transcript from the oral argument shows, Plaintiff's counsel claimed that the transaction should be viewed as a "forced termination" and referred to the sale of assets as part of the termination, and that the termination of "old Kramont" was the taxable event.  The Court rejects this as unsupported in Plaintiff's briefs, and as unfounded in law.  In this context, it is relevant to note that although the parties sometimes referred to old Kramont and new Kramont, the Plaintiff Kramont existed as the same entity, both before and after the merger; only the ownership changed.  See Tr. 4/17/08, pp. 14-17.

only version of the Partnership Agreement that Plaintiff asserts is relevant is § 10.4, which as

noted above, has to do with the obligation of the partners to pay a percentage of Kramont's

income taxes, as cited in the Grant Thorton letter, also mentioned above.  The Court finds that

these provisions are not controlling because the payment of the taxes that are in dispute were not

for income, but rather were for the sale of assets.  The Court finds the controlling paragraph in

this regard is the following section of the Merger Agreement:

> The parties hereto shall treat the Mergers for all income tax purposes as
> a taxable purchase of assets by Acquiror in exchange for the Merger
> Consideration, and a liquidating distribution of the REIT Merger
> Consideration to the shareholders of the Company within the meaning of
> Section 526(b)(1) of the Code, including filing the Company's final Tax
> Returns consistent with such treatment, and no party shall take any position
> inconsistent with such treatment.

Amended and Restated Agreement and Plan of Merger, January 27, 2005, § 6.3(b).

This paragraph clearly dictates that the taxable event occurred after the "Mergers," which

is Defendant's position, and therefore that "New Kramont," the entity controlled by Centro Watt,

is responsible for the taxes in question.

### B.     Defendant's Motion for Summary Judgment as to Tortious Interference Claim is Granted

The Court will also grant Defendant's Motion for Summary Judgment as to Plaintiff's

claim of tortious interference because Defendant did not commit a tortious act by advising

members of his family about this tax dispute.

In order to prove a claim of intentional interference with a contractual relationship,

Plaintiff must show: (1) the existence of a contractual relationship between the plaintiff and a

third party; (2) an intent on the part of the alleged interfering party to harm the claimant by

interfering with those contractual relationship; (3) absence of privilege or justification for the interference; (4) and damages.  Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. 2003) appeal denied, 847 A.2d 1287 (Pa. 2004).  A plaintiff must also show that a defendant's action was "intentional," "improper" and "purposeful."  Brubaker Kitchens v. Brown, 2008 WL 2123327 (3d Cir. 2008) citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978).  The "nature of the actor's conduct is a chief factor in determining whether the actor's conduct is improper or not, despite harm to the other person."  Restatement (Second) of Torts § 766 (1979).

Defendant did not act improperly by speaking to his family members about whether or not they should pay the taxes demanded by Kramont.  The fact that Defendant's family members believed that he was in charge of Kramont before the company's sale does not, as Plaintiff seems to suggest, mean that Defendant could not answer his family's questions regarding the company.  Furthermore, deposition testimony shows that Levy did not tell his family members that they should not pay, but merely advised them that he did not intend to pay and that he would not pay if he were they.  (Pl.'s Mot. for Summary J., Doc. No. 36, at p. 16).

Plaintiff does not have any evidence that the Defendant's conversations with his relatives were intended to harm the Plaintiff, as he was merely expressing his opinion as to who was responsible for the payment of taxes.  Further, the assertion of responsibility for payment of taxes was, in the context of the facts of this case, construed in the light most favorable to Plaintiff, privileged and justified.  Further, for the reasons stated above, there was no contractual obligation on the Defendant to pay the taxes asserted by Plaintiff.  All of these reasons defeat the claim of tortious interference.  Plaintiff has failed to cite any case where a court has held one

-11-

family member liable for offering advice to another regarding responsibility for taxes on the sale

of a mutual investment.  This Court will decline to do so here.

**V.**     **<u>Conclusion</u>**

    For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied and

Defendant's Cross Motion for Summary Judgment is granted.

    An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KRAMONT OPERATING PARTNERSHIP, L.P. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 07-1430 |
| H. IRWIN LEVY | : | |

## <u>ORDER</u>

AND NOW, this    12th       day of June, 2008, it is hereby ORDERED that Plaintiff's

Motion for Summary Judgment (Doc. No. 36) is DENIED and Defendant's Cross Motion for

Summary Judgment (Doc. No. 38) is GRANTED.

Judgment is entered in favor of Defendant and against the Plaintiff.

The Clerk shall close this case.


BY THE COURT:


 s/ Michael Baylson
Michael M. Baylson, U.S.D.J.


A:\07-1430  Kramont v. Levy - Memorandum Summary Judgment.wpd